<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-393 (DLF)** |
| **v.** | : | |
| | : | |
| **MENACHEN COHEN,** | : | |
| | : | |
| **Defendant** | : | |

<div align="center">

**GOVERNMENT'S SENTENCING MEMORANDUM**

</div>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Menachem Cohen to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Menachem Cohen, a 30-year-old property manager, and his unidentified companion,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

---

[1] Defendant Cohen declined to provide the identity of this individual to the FBI, as explained below.  This individual has not yet been charged.

[2] Although the Statement of Offense in this matter, filed on May 26, 2023 (ECF No. 31 at ¶ 6), reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

<div align="center">

1

</div>

Defendant Cohen pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because Cohen: (1) while filming video on his mobile telephone from the West Lawn, was hit with tear gas and observed the mob overrun the police officers defending the entrance to Upper West Terrace; (2) ascended the Northwest scaffolding and filmed other rioters attempting to scale the wall to the Upper West Terrace, commenting to another rioter, "Yeah man, the wall is coming down"; (3) entered the Senate Wing Door at 2:24 p.m., less than 15 minutes after it had been violently breached by rioters, and filmed the broken glass in the door and an audible alarm; (4) penetrated the Capitol through the Crypt to the Capitol Visitor's Center, along with his companion, where he filmed another rioter getting arrested and did not leave until a police officer expressly told him to; (5) while leaving the Capitol, mocked the officers attempting to clear the Upper West Terrace, saying "don't be bullies!"; (6) lied to the FBI about whether his companion, with whom he traveled and walked around the Capitol, had a phone; and (7) has not expressed any remorse for his criminal conduct on January 6.

The Court must also consider that Cohen's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Cohen's crime support a sentence of 14 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 31 (Statement of Offense), at ¶¶ 1–7.

*Defendant Cohen's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Menachem Cohen and his unidentified companion traveled to Washington, D.C. from Brooklyn, NY and attended the former President's "Stop the Steal" rally by the Ellipse.  *See* ECF No. 31 at ¶¶ 8, 9.  Cohen is depicted in a photo from his phone near the Washington Monument, wearing a dark hoodie and jacket.  *See* Image 1.



*Image 1: Photo of Cohen near the Washington Monument*

After the rally, Cohen and his companion joined the crowd on the West Lawn of the U.S. Capitol grounds, near the Northwest Scaffolding.  ECF No. 31 at ¶ 10.  From this vantage point, Cohen saw tear gas that police had deployed against the crowd and took videos on his mobile phone of that action.  Those videos recorded him saying "tear gas," "feel the burn," and showed other rioters pour water in their eyes.  *See, e.g.,* Image 2.  In a later interview with FBI agents, Cohen admitted to feeling the effects of tear gas.



*Image 2: Screenshot from video on Cohen's phone at approximately 2:04 p.m.*

Cohen also observed the crowd overrun a line of police officers defending the stairs to the

Upper West Terrace.  In a video Cohen recorded at approximately 2:10 p.m., the mob of rioters

advanced as onlookers cheered. ECF No. 31 at ¶ 11; *see* Image 3 (screenshot from Exhibit 1).



*Image 3: Screenshot from Exhibit 1 at 0:13*

Undeterred by the violence he had just witnessed, Cohen joined the mob storming the

Capitol and ascended the stairs under the scaffolding himself.  At the top of the stairs leading to

the Upper West Terrace, at approximately 2:19 p.m., Cohen took a video on his phone of other

rioters attempting to scale the wall.   Cohen stated to another rioter, "Yeah man, the wall is coming

down."   *See* Image 4 (screenshot from Exhibit 2).



*Image 4: Screenshot from Exhibit 2 at 0:02*

Again, Cohen pushed ahead.   At approximately 2:24 p.m., Cohen (now wearing a mask)

entered the building through the Senate Wing Door, which had been violently breached by other

rioters less than 15 minutes earlier.   *See* Image 5.   Cohen recorded a video of the shattered glass in

the door as he entered.   An alarm was blaring and rioters were chanting, "USA! USA!"   Cohen

stated, "inside the building."   *See* Image 6 (screenshot from Exhibit 3).



*Image 5 (left): Screenshot from surveillance footage near the Senate Wing Door, Cohen circled*
*Image 6 (right): Screenshot from Exhibit 3 at 0:01*

From the Senate Wing Door, Cohen and his companion walked to the Crypt, then to the Crypt Lobby East and descended a set of stairs to the Capitol Visitor Center ("CVC") at approximately 2:40 p.m.  While in the CVC, at around 2:41 p.m., Cohen encountered a line of police officers and filmed them as they attempted to arrest another rioter.  *See* ECF No. 31 at ¶ 15; Image 7 (screenshot from Exhibit 4).



*Image 7: Screenshot from Exhibit 4 at 0:07, with attempted arrest circled*

Shortly after, police officers warned the group of rioters, including Cohen, that someone was firing gunshots upstairs on the House floor, and told Cohen to leave the Capitol building.  *See* ECF No. 31 at ¶ 16.  Then—and only then—Cohen walked back the way he came to the Senate Wing Door.  *Id.* ¶ 17.

When he reached the Senate Wing Door, Cohen took a video of police officers trying to secure the door against a renewed attack by additional rioters outside.  *See* ECF No. 31 at ¶ 17, Image 8 (screenshot from Exhibit 5).  Cohen, holding his hands up, exited the Capitol through the broken window to the left of the officers at approximately 2:48 p.m.  *See* ECF No. 31 at ¶ 17; Image 9.  In total, Cohen spent approximately 24 minutes inside the Capitol Building.

 

*Image 8 (left): Screenshot from Exhibit 5 at 0:07*
*Image 9 (right): Screenshot from surveillance video near the Senate Wing Door at approximately 2:48 p.m., with Cohen circled*

About three minutes after he left the Capitol Building, Cohen observed a group of police officers attempting to re-secure the Upper West Terrace. *See* ECF No. 31 at ¶ 18. As he filmed them, Cohen mocked these officers, saying, "Don't be bullies." *See id.*; Image 10 (screenshot from Exhibit 6). Cohen later said that, after he left, he saw people screaming at officers and officers screaming back.



*Image 10: Screenshot from Exhibit 6 at 0:03*

*Cohen's Interviews with the FBI*

After he was identified and approached by the FBI, Cohen voluntarily interviewed with FBI investigators on at least four occasions prior to his arrest: June 3, 2022, June 9, 2022, July 28, 2022, and November 1, 2022.  Cohen admitted to going inside the U.S. Capitol on January 6, 2021, and to being exposed to tear gas.  Cohen also explained that he was non-political and went with his friend to D.C. because he had been very bored during COVID and wanted to get out of the house.

Cohen minimized some aspects of his January 6, 2021 conduct.  On June 3, 2022, Cohen said that members of the crowd were yelling for others to come inside, and that he walked through wide open doors into the Capitol.  On June 9, 2022, Cohen said that he flowed with the crowd towards the U.S. Capitol and was not pushed, but at the entrance to the U.S. Capitol, someone dressed in regular clothes was standing there and urging others to come inside.[3]  Cohen's other explanations of what he did and saw inside generally appear consistent with the rest of the evidence,[4] including that his first direct interaction with police was when they told him there was an active shooter situation and he needed to leave.

Cohen expressed a desire to take responsibility for his own actions but did not assist in the investigation of—and lied about—his companion.  On June 3, June 9, and November 1, 2022, Cohen said that if there were consequences to entering the Capitol, he would accept them.  Cohen also showed investigators several videos and images on his phone and identified himself in some

---

[3] The thrust of this statement is largely belied by the video evidence on defendant's own phone, which shows police in riot gear attempting to defend the adjacent Parliamentarian door and Cohen walking up to and through the Senate Wing Door with seemingly little encouragement from other rioters.

[4] For instance, Cohen admitted to seeing the broken glass in the door and to seeing an "arrest." However, the video evidence from his phone only supports Cohen's statement that he saw people screaming at officers, not that the officers were screaming back.

of them.  However, on July 28, 2022, in addition to reiterating that he did not want to provide investigators with his companion's name, Cohen stated that his friend did not have a cell phone. This was not true, as Cohen had stated in an earlier interview that his friend may have called him, and a video from Cohen's phone shows his companion holding a cellphone.  When confronted with this inconsistency on November 1, 2022, Cohen provided no explanation and again contradicted himself—stating first that his friend had a phone, but did not use it for communication, and then stating that he did in fact communicate with his friend by phone.

*The Charges and Plea Agreement*

On November 15, 2022, the United States charged Cohen by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 21, 2022, law enforcement officers arrested Cohen at his home in Brooklyn, NY. On November 30, 2022, the United States charged Cohen by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On March 16, 2023, pursuant to a plea agreement, Cohen pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Cohen agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Cohen now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Cohen faces up to six months of imprisonment and a fine of up to $5,000. Cohen must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing Cohen's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Cohen, the absence of violent or destructive acts is not a mitigating factor. Had Cohen engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors here is the timing and circumstances of Cohen's entry into the Capitol.  Cohen saw and felt tear gas, and watched the crowd overrun the line of police officers defending the entrance to the Upper West Terrace.  Nonetheless, Cohen subsequently followed the mob up the Northwest scaffolding and entered the building through the Senate Wing Door at 2:24 p.m., a major entry point into the Capitol that day, less than 15 minutes after it was breached.  Although Cohen attempted to minimize his conduct by saying the doors were open, he saw the shattered glass in the door and would have heard a blaring audible alarm.

Cohen spent about 24 minutes inside the building and penetrated deep into the building—all the way to the Capitol Visitor Center.  He saw other rioters and police at various points inside. Although Cohen said he left the building when he was told to leave, the circumstances of his entry, the arrest of another rioter in the CVC in front of him, and the presence of other rioters inside the Capitol building told him that he was not supposed to be there long before he was ordered to exit.

Cohen's reaction to police is also troubling.  As Cohen left the building, he saw the efforts of police officers to resecure the Senate Wing Door from rioters and held up his hands.  However, mere minutes later, Cohen mocked officers as they attempted to clear the Upper West Terrace from rioters, saying, "don't be bullies."  These words reflect Cohen's lack of remorse that day, as they encouraged and elevated other rioters as the "victims" and minimized the officers' struggle to resecure the Capitol complex—even though Cohen earlier saw them overrun.

Cohen has taken responsibility for his conduct on January 6, 2021 by admitting to going into the Capitol, and accepting a plea in this case.  Nonetheless, his acceptance of responsibility is at least partly offset by Cohen's mocking of police on that day and his lie to the FBI about his companion's phone, presumably to stymie the FBI's attempts to identify him.

Accordingly, the nature and the circumstances of this offense establish the need for an incarceratory sentence.

### B.  Cohen's History and Characteristics

As set forth in the PSR, Cohen has no criminal history.  ECF No. 32 ¶¶ 32–33. Nonetheless, Cohen's four instances of non-compliance with his pre-trial reporting requirements

(which the Court addressed and increased)[5] are concerning for his ability to comply with conditions short of incarceration. *See* ECF No. 32 at ¶ 5.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr.

---

[5] The undersigned is not yet in possession of an updated pre-trial compliance report since the Court increased defendant's reporting requirements.  However, the undersigned was informed by the Eastern District of New York's pretrial services office that Cohen has never fulfilled the simple requirement of providing proof of his current residence.

10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Cohen's initial pretrial non-compliance supports the need for specific deterrence.   In addition, Cohen told the FBI that he went to Washington D.C. because he was bored and his companion—a member of his community—told him to go.   Such influences may very well reoccur.   Cohen's sentence must provide a sufficient counterweight to adequately deter him from ever again choosing to join in a violent mob as he did on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Cohen based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cohen has pleaded guilty to 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor.  18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." *Id.* Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, 21-cr-198 (TSC), Tr. 10/21/21 at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

14

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1096. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, 21-cr-272 (TJK), Nov. 9, 2021 Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, 21-cr-309, Dec. 1, 2021 Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the recommendations and sentences in three recent parading cases before this Court provide helpful guideposts in fashioning Cohen's sentence. In *United States v. Jackson Kostolsky*, like here, the defendant was tear gassed, entered the Capitol through a door shortly after

its breach, left only after police told him to get out, and lied to FBI (albeit about entering the Capitol).  1:21-CR-00197 (DLF) (D.D.C.).  Unlike Cohen, Kostolsky also bragged to friends, scaled a wall to the Upper West Terrace, and deleted videos from his phone. The Court imposed a sentence of 30 days' home confinement as a condition of 36 months' probation.  Cohen's conduct was more egregious than Kostolsky's, as the latter spent only 10-13 <u>seconds</u> inside the Capitol, whereas Cohen spent 24 minutes inside and penetrated far deeper into the building. Unlike Cohen, Kostolsky did not mock police officers after he left.

Similarly, in *United States v. Carey Jon Walden*, the defendant, who was a former member of the armed services, brought a gas mask to DC, scaled a wall outside the Capitol, and entered through the broken window next to Senate Wing Door.  1:21-CR-00548 (DLF) (D.D.C.).  Like Cohen, Walden took photos and videos during the entire experience, though Walden also made posts to social media indicating a lack of remorse.  The Court imposed a sentence of 30 days' home confinement as a condition of 36 months' probation.  Unlike Walden, Cohen did not appear to prepare for violence on January 6.  But Cohen also showed lack of remorse by mocking officers trying to clear the Upper West Terrace and lied to the FBI about his companion.  Cohen also was tear gassed, witnessed rioters overrun the Northwest stairs, spent more than twice as long inside the Capitol (24 minutes instead of nine) and traveled deeper inside the building.

On the other end, in *United States v. Jacob Garcia*, the defendant scaled the walls outside of the Capitol using repurposed metal fencing, mocked police officers both inside and outside of the Capitol, encouraged rioters to enter the building and to push past or move against police officers in the Crypt and the Rotunda, was inside the Capitol for nearly an hour in six different areas, and made posts on Facebook indicating he regretted not getting souvenirs, thereby demonstrating a lack of remorse.  22-cr-118 (DLF) (D.D.C.).  The Court imposed a sentence of 30

days' intermittent confinement as a condition of 24 months' probation.  Cohen spent about half the time in the Capitol and in fewer areas, and Cohen did not encourage other rioters either to enter the building or move against police officers.  However, the circumstances of Cohen's entry (including witnessing rioters overrunning police and scaling walls), his similar mocking of officers outside, and his lie to the FBI suggest that a term of incarceration is merited here too.

The government acknowledges that this Court has imposed probation-only sentences for parading pleas with similar factors.  *See, e.g., United States v. Patricia Todisco*, 21-CR-205 (DLF) (D.D.C.) (Todisco entered the Senate Wing Door after watching other rioters forcing their way in, filmed her time inside, joined the mob's chants, and entered a sensitive space); *United States v. Louis Hallon*, 22-CR-217 (DLF) (D.D.C.) (Hallon observed violence, was the subject of tear gas, entered while filming the violence, witnessed police officers clearing the Rotunda but did not immediately leave, minimized his unlawful conduct, and had not expressed genuine remorse).  Cohen's mocking of police and outright lie about his companion also bespeak a need for a more severe sentence.

Other judges have imposed incarceration for similarly situated (or even less culpable) January 6 defendants. In *United States v. Brandon and Stephanie Miller*, 1:21-cr-266, the defendants, husband and wife, entered the Capitol building through the Senate wing window about 45 minutes after breach, long after Cohen did.  Brandon Miller videotaped the riot on Facebook live.  Both defendants showed pride in having gone to the Capitol after January 6.  But neither lied to the police nor mocked them. After both defendants pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), Judge Chutkan sentenced both defendants to 14 days' incarceration.

In *United States v. Nicholas Hendrix*, 1:21-cr-426, the defendant, a 35-year-old veteran of the United States Army, entered the Capitol through the Rotunda Doors despite the presence of

police officers trying to keep the rioters out of the building.  Unlike Cohen's protracted stay inside the Capitol, Hendrix's presence in the Capitol was brief, amounting to approximately 90 seconds. By his own admission, he considered re-entering the Capitol, but exposure to chemical spray deterred him. After Hendrix pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), Judge Kollar-Kotelly sentenced him to 30 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[7]

---

[7] Although other judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses, this Court has rejected that view. *See, e.g.*, *United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)); 18 U.S.C. § 3561(a)(3).

On the other hand, this Court and others have concluded it has authority to impose a term of incarceration as a condition of probation under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. *See Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). Courts have consistently found that such a sentence is permissible for up to two weeks'

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Cohen to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:      /s/ *Michael L. Barclay*
<div style="margin-left:40%">
MICHAEL L. BARCLAY
Assistant United States Attorney
Member of New York Bar
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
Michael.Barclay@usdoj.gov
(202) 252-7669
</div>

---

imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## CERTIFICATE OF SERVICE

On this 5th day of June 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
Member of New York Bar
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
Michael.Barclay@usdoj.gov
(202) 252-7669