# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 1:22-cr-00393 (DLF)** |
| | : | |
| **MENACHEM COHEN,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Menachem Cohen, by undersigned counsel, hereby submits this memorandum in anticipation of sentencing, which is scheduled for June 12, 2023, at 2 p.m. Mr. Cohen pled guilty to one count of unlawful parading, demonstrating, or picketing in the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor. As Mr. Cohen has forthrightly admitted since he was first contacted by the FBI in June 2022, five months before his arrest, he committed this misdemeanor offense when he entered the United States Capitol without authorization on January 6, 2021, while a joint session of Congress met to certify the Electoral College vote for the 2020 presidential election. For this crime, we respectfully submit, Mr. Cohen should receive a probationary sentence with the condition that he complete 60 hours' community service. This punishment is on par with the type of sentence this Court has imposed upon comparable January 6 misdemeanants. We ask that the Court punish Mr. Cohen consistently with that sentencing practice.

## I.     The defense has no objections to the PSR.

Mr. Cohen has no objections to the final Presentence Investigation Report. In particular, we agree that the United States Sentencing Guidelines do not apply to his Class B misdemeanor offense, and that he is subject to a maximum 6-month period of imprisonment or five-year probationary term. *See* PSR ¶¶ 31, 61, 65.

## II.      A sentence of probation with 60 hours' community service should be imposed under 18 U.S.C. § 3553(a).

In imposing sentence upon Mr. Cohen, this Court must consider the relevant factors set forth in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense and the history and characteristics of the defendant, *id.* § 3553(a)(1); the kinds of sentences available, *id.* § 3553(a)(3); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6). Ultimately, the Court must fashion a sentence that satisfies the purposes of sentencing. These include imposing a punishment that: reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; deters the defendant and the public; protects the public from further crimes by the defendant; and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* § 3553(a)(2). In fashioning this sentence, the Court is bound by "the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with'" those purposes of sentencing. *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)).

Here, the balance of those factors favor a probationary sentence. Mr. Cohen's crime is not so aggravated as to require imprisonment, as revealed by this Court's sentencing of similarly situated defendants. Like many other January 6 misdemeanor offenders who entered the Capitol and were spared imprisonment, Mr. Cohen unlawfully entered the building after ignoring obvious red flags that he lacked authorization to do so, such as the Capitol police's use of teargas and force to keep out the crowd. Further, like other misdemeanants sentenced to probation, he remained inside the Capitol for under 30 minutes, where he documented the destruction and chaos using his phone; made non-threatening statements such as "the wall is coming down" and

that the police not "be bullies." And like those comparable misdemeanor offenders, he admitted his crime, assisted the FBI's investigation, and pled guilty at the first opportunity.

Although the government will seek a short term of imprisonment for Mr. Cohen, there is nothing especially aggravated about the nature and circumstances of his offense meriting that punishment. And what basis there may be it is offset by several mitigating factors in Mr. Cohen's favor, including his responsibilities to his wife and two very young children, his nonexistent criminal history, and the absence of any about the 2020 presidential election being stolen or expressions of pride about his involvement in the Capitol riot.

Ultimately, Mr. Cohen does not require imprisonment to achieve the ends of sentencing. Rather, a probationary sentence with 60 hours' community service would be sufficient, but not greater than necessary, to afford just punishment, deter him and the public from future misconduct, and provide him with any appropriate correctional services.

### A.  Nature and circumstances of the offense.

Mr. Cohen's conduct on January 6, 2021 was illegal. Before he was arrested, he acknowledged to FBI agents that that he broke the law by entering the Capitol knowing he lacked authority to do so. And since his arrest, he has accepted responsibility for that conduct. In particular, although Mr. Cohen did not act with the purpose of obstructing Congress's proceedings, he recognizes the he helped contribute to the temporary cessation of our republic's passage of power. He accepts full responsibility for his role in causing that harm to our country and democratic system of government.

In assessing the nature and circumstances of Mr. Cohen's offense, however, the Court should consider more than the collective injury he and thousands of others caused on January 6. We respectfully request that the Court examine the particular actions Mr. Cohen took that day,

and consider how they compare to the spectrum of behavior by other individuals who committed similar misdemeanor offenses in the Capitol.

### 1. Mr. Cohen entered and remained in the Capitol for approximately 24 minutes, but left when ordered to do so by police.

Paragraphs 13-25 of the PSR set forth in general terms how Mr. Cohen violated the law. These paragraphs are drawn nearly verbatim from the statement of the offense that he adopted in his guilty-plea allocution. We do not dispute anything in the PSR, but provide here supplemental information that gives more detail and context about what precisely Mr. Cohen did in committing this misdemeanor offense.

Mr. Cohen traveled from Brooklyn, New York, to Washington, DC, early in the morning on January 6, 2021. PSR ¶ 13. He made this trek because a friend invited him to see what was going to happen at the Stop the Steal rally. He did not have any strongly held political beliefs and had not voted in the 2020 presidential election—or any previous election, for that matter. He came to Washington not to support President Trump, but out of curiosity and boredom.

Mr. Cohen's wife, Hadar, described to the FBI that he was feeling cooped up after months of COVID-19 lockdown and the birth of their first-born child. As a member of Brooklyn's Lubavtich Hasidic community, he was "not able to go to bars or do other things to 'air out,'" and instead "liked to go to events where [he] could watch things and it was considered 'kosher.'" Ex. A.[1] Ms. Cohen remembers that her husband "was excited to go and see people and politicians"; because he did not watch television, he "considered going to Washington, DC, and seeing lots of people to be entertainment like watching a show." *Id.*

---

[1] Exhibit A is being filed separately under seal, because it was designated "sensitive" pursuant to the Court's protective order. *See* ECF No. 16.

Mr. Cohen thus attended the Stop the Steal rally with the expectation that he would remain a spectator. But it turned into much more. He heard President Trump exhort the crowd "to walk down to the Capitol" and warn them that "if you don't fight like hell, you're not going to have a country anymore." Brian Naylor, *Read Trump's Jan. 6 Speech, a Key Part of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial. He then followed the crowd as it progressed from the Ellipse to the northwest corner of the Capitol grounds. There, he was exposed to teargas and observed rioters break through a line of police officers on the Upper West Terrace. PSR ¶¶ 15-16. He captured those events on his phone's camera. He then followed the crowd up the stairs to the terrace and, along the way, stopped to video record rioters scaling the Capitol's walls. PSR ¶ 17. In this video, Mr. Cohen can be heard saying "yeah, man, the wall is coming down" to another person off camera.

Mr. Cohen then entered the Capitol through the Senate Wing Door at approximately 2:24 p.m., less than 15 minutes after that entryway had been breached by rioters. PSR ¶ 18. He video-recorded his entrance through the doorway; upon entering, he could see that the doorway's windows were smashed and could hear the building's alarm system. *Id.* He spent approximately 24 minutes in the Capitol. *Id.* ¶ 22. During that time, he wandered to the building's Crypt and Visitor's Center, where he video-recorded a rioter being arrested by police. *Id.* ¶ 20. He left the building after a gunshot was heard upstairs and Capitol police ordered him and other to vacate. *Id.* ¶¶ 21-22. Mr. Cohen returned to the Senate Wing Door he initially entered and exited through a broken window next to it. *Id.* ¶ 22. While outside on the Upper West Terrace, he took one more video where he told an assembled line of police officers, who were clad in riot gear and pushing

rioters with batons, "don't be bullies." *Id.* ¶ 23. Mr. Cohen left the Capitol shortly thereafter. That night, he and his traveling companion returned to Brooklyn.

### 2. Mr. Cohen voluntarily met with and was interviewed by the FBI on four occasions before his arrest, and promptly pled guilty.

On November 21, 2022, Mr. Cohen was arrested for unlawfully entering the Capitol. Before his arrest, however, the FBI had met with him about his January 6 conduct on four separate occasions.

On June 3, 2022, Mr. Cohen spoke to the FBI outside his house. During that meeting, he confirmed his identity and contact information. He described how he came to Washington, his attendance at the Stop the Steal rally, his movement with the crowd to the Capitol grounds, being teargassed and witnessing the terrace breach, his entrance into the Capitol, what he witnessed inside, and his exit after the police reported that gunshots had been fired. Mr. Cohen also admitted using his phone inside the Capitol and showed the FBI photographs and videos he took on January 6. Mr. Cohen declined, however, to give information about the person with whom he traveled to Washington and entered the Capitol. He explained that he had a religious objection to informing the government about another Lubavitch community member's actions.

On June 9, 2022, Mr. Cohen spoke again with the FBI. As before, he declined to provide information about the person with whom he traveled, citing his religious and community scruples. But he provided the FBI more detail about what he observed at the Stop the Steal rally, outside the Capitol grounds, on the Upper West Terrace, and then within the Capitol. In particular, Mr. Cohen said that when he was inside the building, he did not know where to go or what he was doing, and that his only interaction with law enforcement was in the visitor's center, where he was told to leave the building, which he did. At this meeting, Mr. Cohen provided law enforcement his cell phone pursuant to a search warrant.

On July 28, 2022, Mr. Cohen met with the FBI for a third time, to have his phone returned after the search warrant's execution. During this meeting, Mr. Cohen did not give information about his January 6 traveling companion, but said he would talk to him at synagogue and encourage him to contact the FBI. During this meeting, he told the FBI that this friend did not have a cell phone, which was false.

Finally, on November 1, 2022, Mr. Cohen met with the FBI for the fourth and final time before his arrest. During the meeting, he confirmed details concerning his whereabouts and actions in the Capitol on January 6. He identified and described the contents of photographs and videos that the FBI took from his phone. He offered to check whether he still had the clothing and backpack he wore to the Capitol. Mr. Cohen admitted that his traveling companion owned a cell phone and had one on January 6, 2021, and that he did not tell the truth about this phone at his last meeting with the FBI. He reiterated that he was not comfortable assisting the government's investigation of his friend. Finally, he told the agents that he would accept the consequences for his actions and asked for permission to self-surrender if he were charged.

Over the course of those meetings, Mr. Cohen admitted his crimes on January 6. He told the truth about what he personally did that day and his motivations for coming to Washington. He showed the FBI photographs and videos he took on the Capitol grounds and inside the building that day. He kept his promise not to delete or alter this evidence from his phone, and then identified himself and his voice in the recordings. He told the FBI that he would be a man and accept the consequences for his actions. And, true to his word, he accepted responsibility and pled guilty at the first opportunity the government provided him a plea offer.

Although Mr. Cohen was forthcoming with the FBI about his personal commission of crimes, he declined to give information about the person he traveled with to Washington, DC.

7

Moreover, during one of the meetings, he denied that his friend had a phone that day, which he subsequently admitted—and the FBI knew—was false. Mr. Cohen's refusal to assist the government's investigation of his friend was not based upon animus toward the government. It was rooted, instead, in a religious and cultural belief that it was wrong for him to incriminate another Lubavitch member without that person's knowledge and consent. Mr. Cohen regrets that he misstated to the FBI that his friend did not have a phone. He corrected the false assertion as soon as the government confronted him about it. And for all of his reluctance in providing information about this friend, it remains the case that Mr. Cohen disclosed everything to the FBI about his own crimes and took personal responsibility for them.

### 3.  Mr. Cohen's offense conduct lacks certain aggravating elements found in other January 6 misdemeanor prosecutions.

In considering the nature and circumstances of Mr. Cohen's conduct, the Court should consider not only what he did, but also how his actions compare to those of other January 6 misdemeanor offenders. In particular, the Court should assign considerable weight to the absence of multiple aggravating factors that frequently appear in these misdemeanor cases.

*First*, Mr. Cohen's travels inside the Capitol were relatively limited. He did not proceed to sensitive areas usually cordoned off from the public, like congressional staff offices. He did not attempt to gain access to the House or Senate chambers. He wandered to open spaces, like the Crypt and Visitor's Center, and left as soon as Capitol police directly ordered him to exit.

*Second*, Mr. Cohen did not travel to Washington, DC expecting to engage in any violence or aggression. He did not arrive carrying a weapon or tactical gear. He did not wear or possess any such items while he was present in the Capitol. He did not engage in violent conduct or speech. He did not encourage other rioters to enter the Capitol or resist law enforcement's instructions. He did not even repeat commonly heard provocations like, "we're taking the house

back," or "stop the steal." Mr. Cohen, rather, entered the Capitol as a curious observer of the chaos, and not as an active participant in it. He recognizes now, of course, his role in that day's disorder. But he did not enter the Capitol with the motive of perpetuating it. And the worst that can be said about him was that he admonished Capitol officers who were pushing rioters on the terrace not to be bullies—a relatively tame statement amid the day's pugilism.

*Third*, Mr. Cohen did not engage in boastful or defiant speech online before, during, or after the Capitol riot. Unlike many people who entered the Capitol on January 6, he did not use his attendance as a bragging rite or an opportunity to condemn Congress, the Capitol police, or people with political views different than his own. He did not make threats to return or do worse if Trump did not retain the presidency. Mr. Cohen did not engage in any kind of speech like this because he is politically indifferent. He was only in Washington because he misguidedly thought it would be entertaining to bear witness to this historic moment without becoming a partisan in it.

*Fourth*, Mr. Cohen did not attempt to hide or destroy evidence of his personal participation in the Capitol riot. Unlike other misdemeanor offenders, he did not destroy the pictures or video he took while he was on the Capitol grounds. He did not delete his social media profiles. He did not attempt to conceal anything about his whereabouts on January 6, 2021. To the contrary, he voluntarily admitted everything he did and gave the government full access to his electronic files. The only thing he would not disclose was the identity of his friend.

All told, the most aggravating elements of Mr. Cohen's offense conduct are his entrance into the Capitol despite being teargassed, seeing broken windows, and hearing alarms; his presence in the building for 24 minutes; his recording of the experience on his phone; his admonition to the police that they should not bully the crowd; and his refusal to incriminate his friend and fellow Lubavitch community member. But as discussed below, those factors are not

so aggravated as to make imprisonment necessary. To the contrary, several mitigating factors relating to Mr. Cohen's personal history and characteristics favor a non-incarceration sentence.

### B.  Personal history and characteristics.

In sentencing Mr. Cohen, we respectfully ask that the Court bear in mind three mitigating factors concerning his personal history and characteristics. These are: (1) Mr. Cohen's responsibilities as a father to two young children, (2) his lack of a criminal history, and (3) the absence of personal or political beliefs surrounding the January 6 events that might suggest a likelihood of reoffending. We respectfully submit that these factors significantly diminish the need for imprisonment, notwithstanding his offense conduct.

*First*, Mr. Cohen is a father to two very young sons: Shaked, who is two years old, and Shlomo, who is approximately six months. PSR ¶ 42. Mr. Cohen is married to their mother, Hadar, who does not work, is the children's primary caregiver, and depends on Mr. Cohen's financial and emotional assistance in raising their boys. *Id.*

Mr. Cohen's friends and family all discuss his devotion and care for his family in glowing terms. For example, Deidre Kane, a family friend, observes that "Menachem is a constant support and caretaker for his wife and children. He is a hands-on father as well as the sole bread-winner for the family." Ex. B at 12. Mendy Baoran, a close friend, echoes this:

> Menachem is such a caring person! He does everything he can to support his family and make sure they're doing well. He's always there for his kids and helps them out whenever they need it.

> Menachem is a great dad and helps his wife so much with them. He's also really supportive of his wife. He listens to her and helps her out whenever she needs it. He knows that communication and respect are important for a strong marriage, and he tries to show that every day.

*Id.* at 2. Mr. Cohen's mother, Sabina, adds that, "[b]ecoming a father has been the most transformative event in Menachem's life," and "[h]e has devoted himself wholeheartedly to providing for his family's every need, be it financial, physical, mental, or emotional." *Id.* at 6.

Incarcerating Mr. Cohen would separate him from his wife and children and jeopardize his ongoing employment, on which his family depends. PSR ¶ 42. The burden that imprisonment would place upon Mr. Cohen's wife and vulnerable children is a factor the Court may and should consider in determining whether that form of punishment is warranted here. *See, e.g.*, *United States v. Barnes*, 890 F.3d 910, 919 (10th Cir. 2018) (affirming district court's below-guidelines sentence where it considered, among other factors, defendant's "dependent-heavy family structure" as circumstance mitigating need for government's requested sentence). Beyond that, the Court should also consider how Mr. Cohen's family obligations create a powerful incentive for him to follow the law and comply with the terms of his probation. In the words of his mother, Sabina, "[i]t is clear that the responsibilities of fatherhood have greatly deepened Menachem's sense of responsibility and accountability. This is precisely why I have full confidence that [the] regrettable events like those of January 6, 2021, will never be repeated." Ex. B at 7; *see also id.* at 13 ("Having his second son in the midst of this has grounded him and made him very aware of how much depends on him."). The strength of his family ties significantly reduces the likelihood he will recidivate. That diminishes the need for imprisonment.

*Second*, Mr. Cohen has no criminal history other than this arrest and conviction. *See* PSR ¶¶ 32-37. His criminal history is consistent with the noble and upstanding family and community member his family and friends described in the attached letters of support. *See* Ex. B. That Mr. Cohen has no prior brushes with the law supports the conclusion that his unlawful entry of the Capitol was outlier misbehavior, and not the kind of conduct that can reasonably be expected

11

from him in future. This record supports imposition of a probationary sentence—*i.e.*, a period of time in which the Court can verify Mr. Cohen's willingness and ability to follow the law—and sparing him imprisonment unless and until he commits a subsequent offense.

*Third*, Mr. Cohen is not an ideologue who joined the Capitol riot to advance a political belief about the 2020 election or to prevent the seating of a purportedly illegitimate president. He has no affiliation with any extremist group that was present on January 6. He has no social media trail of statements about the election and the Capitol riot. He does not even have a voting history. In the words of Rabbi Zevi Wineberg, Mr. Cohen "has no political leanings" whatsoever and "is not in any way a radical." *Id.* at 15. His friends "know him to be honest, and never in any way involved in any action that could be deemed radical or violent." *Id.* at 14 (Rafael Rabinovich letter). He was present at the January 6 riot only out of boredom and curiosity—to see what was going to happen.

Mr. Cohen should have exercised better judgment that day by resisting the urge of following the crowd into the Capitol. And at sentencing, he will have to face the consequences for that mistake. But we respectfully submit that the absence of a political motive significantly reduces the likelihood that he will engage in this type of criminal behavior again. A probationary sentence with a community-service condition will ensure that he always prioritizes respect for the law over indulging his own interests. It will be sufficient to prevent him from reoffending.

### C.  A probationary sentence with 60 hours' community service satisfies the ends of sentencing.

A probationary sentence with 60 hours' community is sufficient, but not greater than necessary, to achieve the ends of sentencing. In particular, it will afford just punishment, promote respect for the law, and reflect the seriousness of the offense, as evidenced by the punishments this Court has imposed upon similarly situated defendants. 18 U.S.C.

§ 3553(a)(2)(A). It will also relatedly avoid unwarranted sentencing disparities. *Id.* § 3553(a)(6). Finally, the aims of deterrence, incapacitation, and rehabilitation do not require a sentence of imprisonment. *Id.* § 3553(a)(B)-(D). Continued judicial supervision with a community service obligation would be enough.

      **1.  A probationary sentence is sufficient to afford just punishment and will not create unwarranted sentencing disparities.**

The Court has the benefit of sentencing Mr. Cohen after the sentencings of several hundred January 6 defendants in this district. Defendants in Mr. Cohen's position—misdemeanor offenders who lack significant aggravating offense factors—often (but not always) receive probationary sentences similar to what we propose here. Indeed, based on the government's most recent sentencing data, we have found 16 defendants who meet the following conditions: (1) they were sentenced by this Court, (2) they were convicted of misdemeanors relating to unlawful entry of the Capitol on January 6, 2021; and (3) the government requested a term of imprisonment for them. Under those circumstances, which are also present here, this Court only sentenced one defendant to prison. The remaining 15 defendants—representing 94% of this cohort—received probation, typically with a community service condition and/or a period of home or intermittent confinement.[2]

Additionally, our review of these cases shows that these 15 defendants sentenced to probation did not have facts that were significantly different than Mr. Cohen's. Many had the same aggravating factors: entry into the Capitol after being teargassed or witnessing property damage; entry within 15 minutes of the building's breach; recording the events of the Capitol on their phones; making comments to protestors or the police; and declining to provide some

---

[2] A few of these defendants received fines in addition to their restitution obligations. We respectfully request that the Court not impose a fine, based on Mr. Cohen's inability to pay. *See* PSR ¶ 60.

information or otherwise making misleading statements to the FBI. Some defendants engaged in even more aggravated conduct but still received probationary sentences. We provide here the comparator cases we have identified and, for each, offer a brief description of the aggravating factors the government identified.

- In *United States v. Jason Kostolsky*, No. 21-cr-197 (DLF), the defendant scaled the wall of the Capitol, advanced inside after being teargassed, remained in the building despite hearing alarms and seeing broken windows, bragged to friends about his participation, lied to the FBI in his initial interview, and deleted videos from his phone before the FBI could review it. Gov't Sentencing Mem., ECF No. 41, at 1-2. The Court sentenced defendant to 36 months' probation with 30 days' home detention.

- In *United States v. Carey Jon Walden*, No. 21-cr-548 (DLF), the defendant, a former Marine, was prepared for violence and wore a gasmask during the riot, scaled the Capitol wall, penetrated the building through a broken window, took photos and videos inside, and showed a lack of remorse by posting to Facebook about his exploits. Gov't Sentencing Mem., ECF No. 24, at 2. The Court sentenced defendant to 36 months' probation with 30 days' home detention and 60 hours' community service.

- In *United States v. Andrew Williams*, No. 21-cr-45 (DLF), the defendant penetrated to the Speaker of the House's office, cheered "we're storming the Capitol," walked by broken glass to enter building, boasted that the police could not arrest all of them, took photographs and videos inside that he shared with a group chat, lacked remorse, and knew the danger he was posing as a firefighter and EMT. Gov't Sentencing Mem., ECF No. 35 at 1-2. The Court sentenced defendant to 24 months' probation with 60 hours' community service.

- In *United States v. Verden Nalley*, No. 21-cr-116 (DLF), the defendant, who pled guilty to a class A misdemeanor, 18 U.S.C. § 1752(a)(1), followed crowds into the building, remained in the building for more than 30 minutes, posted messages to social media that displayed a lack of remorse, spread false information on social media downplaying the day's violence, and promised to return with guns in two weeks. Gov't Sentencing Mem., ECF No. 93, at 1-2. The Court sentenced defendant to 24 months' probation with 60 hours' community service.

- In *United States v. Kevin Loftus*, No. 21-cr-81 (DLF), the defendant, a former Army officer, traveled from Wisconsin to Washington, DC, took photos of himself inside the Capitol, and bragged on Facebook that he was wanted by the FBI for storming the

Capitol. Gov't Sentencing Mem., ECF No. 29, at 1-2. The Court sentenced defendant to 36 months' probation with 60 hours' community service.

- In *United States v. Kari Kelley*, No. 21-cr-201 (DLF), the defendant entered the Capitol through a broken window, was among the first to enter the building, witnessed protestors fight with police and back them up against a wall, Facetimed during the riot and pushed her way through the crowd, penetrated to the House Wing doors, used cocaine while on pretrial release, and lied about her drug use. Gov't Sentencing Mem., ECF No. 97 at 1-2. The Court sentenced defendant to 36 months' probation.

- In *United States v. Zachary Martin*, No. 21-cr-201 (DLF), the defendant entered the Capitol through a broken window, was among the first to enter the building, chanted inside Senate Wing Door while police were backed up against a wall by rioters, penetrated to the House Wing doors, livestreamed a video from inside the building, likely destroyed evidence by deactivating his Facebook account, had prior convictions, and twice failed to report to pretrial services. Gov't Sentencing Mem., ECF No. 94 at 2, 20. The Court sentenced defendant to 36 months' probation, 60 hours' community service, and a $1,000 fine.

- In *United States v. Robert Ballesteros*, No. 21-cr-580 (DLF), the defendant entered the Capitol and observed a mob of rioters breach the Senate wing door as a line of police officers tried to subdue them, proudly exclaimed "we broke in" while inside the Crypt, posted videos of himself to his Instagram page, claimed to have captured video of Ashli Babbitt's shooting, deleted social media posts and media files from his phone, had a prior criminal record, and lacked remorse. Gov't Sentencing Mem., ECF No. 36, at 1-2. The Court sentenced defendant to 36 months' probation with 40 hours' community service.

- In *United States v. Edward Spain, Jr.*, No. 21-cr-651 (DLF), the defendant claimed on social media that the Capitol riot was the beginning of civil war, entered the Capitol after seeing police officer be pepper sprayed, spent 30 minutes in the Rotunda while police were trying to control rioters, got into face-to-face confrontation with police, bragged about his conduct on social media, and lied to FBI by saying he wanted to be present to understand history and the Capitol's security measures. Gov't Sentencing Mem., ECF No. 20 at 2. The Court sentenced defendant to 36 months' probation with 60 hours' community service.

- In *United States v. Marissa Suarez & Patricia Todisco*, No. 21-cr-205 (DLF), the defendants, one of whom was a correctional officer, entered the Senate Wing Door after seeing rioters break windows to gain access, wandered the building, took videos of rioters dancing in celebration in the Crypt, joined in chants celebrating the riot, and entered Senator Merkely's office, a sensitive site. Gov't Sentencing Mems., ECF Nos.

53-54, at 1-2. The Court sentenced defendants to 36 months' probation, 60 hours' community service, and a $2,000 fine.

- In *United States v. Lois McNicoll*, No. 21-cr-468 (DLF), the defendant previously toured the Capitol and understood what kind of access was and was not authorized, remained in Capitol for 40 minutes on January 6, only left when ushered out, and lied to the FBI about not taking photographs in the Capitol. Gov't Sentencing Mem., ECF No. 28 at 2. The Court sentenced defendant to 24 months' probation with 80 hours' community service.

- In *United States v. Treniss Evans III*, No. 21-cr-225 (DLF), the defendant, who pled guilty to a class A misdemeanor, 18 U.S.C. § 1752(a)(1), traveled to Washington, DC, knowing that extremist groups were planning to engage in violence at the Capitol, entered the Capitol through a broken window, encouraged other rioters to come in, walked by armed police officers, entered a congressional conference room, and used social media to raise money off his January 6 actions and glorify violence. Gov't Sentencing Mem.. ECF No. 40 at 2. The Court sentenced defendant to 36 months' probation, 20 days' intermittent confinement, and a $5,000 fine.

- In *United States v. Jacob Garcia*, No. 22-cr-118 (DLF), the defendant scaled the walls of the Capitol, yelled at police officers, encouraged rioters to enter, was inside the building for an hour and gained access to a sensitive staff office areas, encouraged the mob to push against and past the police, and boasted about his activity on Facebook. Gov't Sentencing Mem., ECF No. 26 at 2. The Court sentenced defendant to 24 months' probation and 30 days' intermittent confinement.

- In *United States v. Lawrence Ambrose*, No. 22-cr-302 (DLF): the defendant was present in the Capitol for 30 minutes, advanced to the House floor entrance, witnessed violence there including the shooting of Ashli Babbitt, fist-pumped other rioters in the Speaker's lobby, and was present for a short period in the Speaker's suite of offices. Gov't Sentencing Mem., ECF No. 15 at 2. The Court sentenced defendant to 36 months' probation with 45 days' home detention and 60 hours' community service.

- In *United States v. Luis Hallon*, No. 22-cr-317 (DLF), the defendant observed violence in and around the Capitol, entered after being teargassed, filmed and took videos of his entrance, did not immediately heed instructions to exit the Rotunda, minimized his conduct with the FBI, and did not express sincere remorse. Gov't Sentencing Mem., ECF No. 34 at 1-2. The Court sentenced defendant to 24 months' probation with 60 hours' community service.

The only example we found of this Court sentencing a misdemeanor offender to a term of

imprisonment was *United States v. Matthew Webler*, No. 21-cr-741 (DLF). There, the defendant

entered the Capitol through a broken window and advanced past broken glass and damaged property. He cheered on the breach, made statements on social media expressing a lack of remorse, and expressed no remorse to law enforcement after his arrest. Gov't Sentencing Mem., ECF No. 22, at 1-2, 10-13. The critical factor distinguishing him from Mr. Cohen and the other defendants mentioned above was his criminal history. The defendant had 11 prior convictions, including two for aggravated assault; had a history of multiple probation violations; and when he was arrested by the FBI, was in possession of a rifle, resulting in a separate charged for violating 18 U.S.C. § 922(g). *Id.* at 12-13, 16-17. That prior and ongoing history was significantly more severe than the records for Mr. Cohen and the other misdemeanor cases prosecuted before this Court. Consequently, the Court imposed a sentence of 45 days' imprisonment.

As these cases illustrate, just punishment that reflects the seriousness of the offense and promotes respect for the law can be achieved for Mr. Cohen's crime without incarceration. *See* 18 U.S.C. § 3553(a)(2)(A). The sufficient, but not greater than necessary, punishment to meet this end of sentencing can be accomplished with probation. Further, the sentence we respectfully seek would avoid creating disparities with the sentences this Court has imposed upon similarly situated defendants. *See id.* § 3553(a)(6).

### 2. Deterrence, incapacitation, and rehabilitation are sufficiently served by a non-incarceration sentence.

A probationary sentence is sufficient to achieve the ends of deterrence, incapacitation, and rehabilitation. Mr. Cohen does not need to be imprisoned to be dissuaded from violating the law again. Indeed, no Court intervention is needed at this point. The public shaming Mr. Cohen has experienced in his Hasidic community since his arrest has been punishment enough. As his friend Yosef Hershkop describes:

> When someone is arrested especially by federal authorities it's big news in the Hasidic community we are both members of, there's no way to keep that kind of

news quiet it's an extremely embarrassing situation and although many people will step up to the plate with offers of support there's no getting around that it's a stain on you and I've seen how uncomfortable it's been for Mr Cohen since the news broke. You can see how people stare at him and whisper about him, regardless of the outcome of this case; he'll never be able to erase the tweets and news articles which tie him in an extremely negative manner to one of the most shocking dates in American history. The anxiety and emotional duress Mr Cohen has lived with the past two and half years knowing that at any minute he could be arrested is punishment enough, there's no question that not only would he never participate in such an activity again he'd think ten times before participating even in completely legal protest like activities. He's learned a very rough lesson in what it means to stay out of trouble.

Ex. B at 9-10. Indeed, as a result of Mr. Cohen's arrest and conviction "his family are ashamed to walk the streets of our community" and he "does not attend the synagogue he used to anymore because of the rumors and pictures of his arrest all over the community." *Id.* at 2 (Mendy Baoron letter). Imprisonment is not going to teach Mr. Cohen respect for the law more powerfully than this community stigma. For that reason, it is unnecessary to afford specific deterrence.[3]

A probationary sentence is also sufficient to achieve general deterrence for Mr. Cohen's criminal conduct. This is clear from the Court's imposition of similar sentences upon the misdemeanor offenders listed above, including defendants who, unlike Mr. Cohen, did not express remorse or were defiant and boastful about their actions on January 6. If probation was sufficient for those defendants to deter the public, we respectfully submit that the same conclusion should follow here, too.

---

[3] In March 2023, Mr. Cohen was the subject of a pretrial violation memorandum based upon his failures to report to his Pretrial Services officer and provide verification of his employment and residence. PSR ¶ 5. Mr. Cohen has since provided that verification and has not had any violation, even after his reporting requirement was increased. His improved performance on pretrial supervision should mitigate the argument that imprisonment is needed to induce him to comply with the Court's rules. We also note that this Court has not imprisoned other misdemeanor offenders who have imperfect pretrial supervision records. *See, e.g.*, *United States v. Kari Kelley*, No. 21-cr-201 (DLF); *United States v. Zachary Martin*, No. 21-cr-201 (DLF).

Finally, there are no rehabilitative, educational, or vocational services that the Bureau of Prisons can provide Mr. Cohen that he cannot obtain more effectively in the community. If anything, imprisonment will likely interfere with Mr. Cohen's rehabilitation by separating him from him medication and community healthcare. Mr. Cohen is Type I diabetic and relies on daily insulin. PSR ¶ 45. Imprisoning him creates risk that his insulin could be discontinued, since he will have to rely on BOP health services and will not be able to manage his own healthcare. This sentencing factor most obviously favors a non-incarceration sentence. It, like the other sentencing purposes of 18 U.S.C. § 3553(a)(2), supports a sentence of probation.

### 3. A community service condition is particularly appropriate for this caring and compassionate defendant.

In closing, we note that Mr. Cohen is a good fit for a community service condition of probation. Friends and family uniformly describe him as someone motivated to help others. "The very core of Mendy is a giver," his sister Chana Cohen writes. "[H]e has a burning passion to give back and lend a helping hand. His whole life he's been generous with his company, time, money, and home." Ex. B at 3. Friend Rafael Rabinovich writes that, "I have witnessed firsthand his kindness and generosity towards his family, myself, and others. He is always willing to lend a helping hand to those in need." *Id.* at 14. Yosef Hershkop offers the following recollections:

> I've seen him in the synagogue on a weekday (we don't use money on the sabbath) there isn't a single time where I didn't see him handing out charity to the local homeless and others down on their luck I also saw how he much he cared for more than one friend of his who unfortunately became dangerous drug users he understood their struggles and never mocked them and only gave them encouragement while working to get them proper treatment. He's also known to befriend and care for the Non English speaking yeshiva students who arrive in our neighborhood to learn in local schools. Many of them get really lost and he's known to be a big help to them.

*Id.* at 9. Finally, Mendy Baoran summarizes Mr. Cohen this way: "Even when things are tough, he's always doing his best to help out his community and make a positive impact. He's a true inspiration and shows us that we can all make a difference in the world if we try." *Id.* at 2.

Mr. Cohen is prepared to prove that he really is the generous and caring person his friends and family describe, and that he is more than the misdemeanor crime that brings him before the Court. He respectfully requests that the Court grant him that opportunity by sentencing him to a period of probation coupled with a 60-hour community service obligation.

### III.    Conclusion.

Menachem Cohen violated the law by unlawfully entering the Capitol on January 6, 2021. He admits it, accepts responsibility, and is remorseful. He deserves punishment. Based on this Court's treatment of similarly situated offenders, as well as Mr. Cohen's personal mitigating factors, a period of probation with a community service condition is appropriate. That sentence, we respectfully submit, is sufficient but not greater than necessary to achieve the ends of sentencing. We ask that the Court impose it when Mr. Cohen appears for sentencing.

Respectfully submitted,

/s/
Benjamin Yaster
NY Bar No. 4722567
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1291
Benjamin_Yaster@fd.org
*Counsel for Menachem Cohen*

Dated:        June 5, 2023

<u>**CERTIFICATE OF SERVICE**</u>

On June 5, 2023, I served a copy of the foregoing Defendant's Sentencing Memorandum

on counsel of record for the government via the Court's Electronic Filing System (CM/ECF).

<u>/s/ Benjamin Yaster</u>
Benjamin Yaster
Federal Defenders of New York, Inc.
*Counsel for Menachem Cohen*